RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SYLVESTER GAILES,

*Defendant-Appellant*.

> No. 23-5928

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:22-cr-20250-1—Thomas L. Parker, District Judge.

Argued: September 10, 2024

Decided and Filed: October 10, 2024

Before: MOORE, McKEAGUE, and GRIFFIN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Unam Peter Oh, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Regina Brittenum, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Unam Peter Oh, Brian Daniel Mounce, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. Regina Brittenum, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

———————————

## OPINION

———————————

GRIFFIN, Circuit Judge.

Each year, millions of acts of domestic violence, and over 1,500 deaths from domestic violence, occur in this country.[1] While the law has long prohibited felons from possessing firearms, many domestic-violence offenders are convicted of mere misdemeanors. So, in 1996, Congress prohibited domestic-violence misdemeanants from possessing firearms in order "to close a dangerous loophole in the gun control laws," given that "firearms and domestic strife are a potentially deadly combination." *United States v. Castleman*, 572 U.S. 157, 159–60 (2014) (internal quotation marks and brackets omitted). In *Stimmel v. Sessions*, 879 F.3d 198, 201 (6th Cir. 2018), we previously upheld this proscription, 18 U.S.C. § 922(g)(9), as constitutional. But the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), requires us to reconsider our precedent. We now hold that, even though *Bruen* abrogated *Stimmel*, the result remains the same: 18 U.S.C. § 922(g)(9) is facially constitutional.

I.

Gailes is a serial perpetrator of domestic violence. In 2012, he struck his girlfriend in her face with a closed fist. Two years later, he dragged the same woman—with their children present—"by her hair, pulling out clumps of her hair in the process . . . [and] then pushed her to the ground and kicked her in the head." And in 2018, he entered a different ex-girlfriend's residence uninvited and demanded that she cook him something to eat; when she refused, Gailes pulled her "off the couch by her arms," "grabbed [her] around the neck with his forearm choking her," said "'I can end it here[]' and pulled out a handgun," and then "began to hit [her] about her

---

[1]Jason Zenor, *If You See Something, Say Something: Can Artificial Intelligence Have a Duty to Report Dangerous Behavior in the Home?*, 98 Denv. L. Rev. 839, 848 (2021) (citing Martin R. Huecker, Kevin C. King, Gary A. Jordan & William Smock, *Domestic Violence*, Nat'l Inst. of Health, https://www.ncbi.nlm.nih.gov/books/NBK499891/ (last updated Apr. 9, 2023) [https://perma.cc/KBN9-67FQ]).

face and body." The victim there "was in fear [for] her life." For each incident, Gailes was convicted of a domestic-violence misdemeanor in Tennessee.

A few years later, Gailes was involved in an automobile accident. Responding officers found Gailes in possession of two loaded pistols. His three domestic-violence-misdemeanor convictions prohibited him from possessing those guns, so a grand jury indicted him on two counts of possessing firearms in violation of § 922(g)(9). Gailes moved to dismiss the indictment, arguing that § 922(g)(9) is facially unconstitutional in light of *Bruen*. The district court denied the motion. Gailes then pleaded guilty to both counts, and the district court sentenced him to 50 months' imprisonment. This appeal followed.

II.

Section 922(g)(9) prohibits anyone "who has been convicted in any court of a misdemeanor crime of domestic violence" from transporting, receiving, or possessing a firearm or ammunition. Generally, a "misdemeanor crime of domestic violence" means an offense requiring proof of "the use or attempted use of physical force, or the threatened use of a deadly weapon," against another person with whom the offender has a familial, intimate, or cohabitation relationship. 18 U.S.C. § 921(a)(33). Gailes neither disputes that he has previous domestic-violence convictions nor that they qualify as predicate offenses under § 922(g)(9). Rather, Gailes argues that § 922(g)(9) facially violates the Second Amendment.

A facial challenge "is the most difficult challenge to mount successfully[] because it requires a defendant to establish that no set of circumstances exists under which the [challenged statute] would be valid." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (internal quotation marks omitted). Therefore, if § 922(g)(9) "is constitutional in even just one of its applications," Gailes's facial challenge must fail. *See United States v. Williams*, 113 F.4th 637, 643 (6th Cir. 2024). We review the district court's refusal to dismiss the indictment on constitutional grounds de novo. *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).

III.

A.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held that "the Second Amendment confer[s] an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Further, this right is applicable to the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010). However, the right to possess arms "is not unlimited." *Heller*, 554 U.S. at 626. Indeed, in *Heller*, the Supreme Court emphasized that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27.

Following *Heller* and *McDonald*, we, like several of our sister circuits, developed a two-step test that applied "means-end scrutiny" for analyzing laws that might infringe on individuals' Second Amendment rights. *See, e.g.*, *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 685 (6th Cir. 2016) (en banc) (collecting cases). We used that test to uphold § 922(g)(9)'s constitutionality in *Stimmel*. 879 F.3d at 204, 211.

But in *Bruen*, the Supreme Court ruled our means-end-scrutiny framework inconsistent with *Heller* and *McDonald* and announced a different two-step test for Second Amendment questions. Under *Bruen*'s first step, courts must ask whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* Then under the second step, the burden shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* For the government to meet its burden, it need not identify a "dead ringer" or "historical twin" to the challenged regulation. *Id.* at 30 (emphasis omitted). Instead, the challenged regulation must be "relevantly similar" to a historical one. *Id.* at 28–29 (citation omitted).

Earlier this year, in *Rahimi*, the Supreme Court applied for the first time *Bruen*'s two-step framework. *Rahimi* also involved a statute targeted at keeping guns out of the hands of domestically violent individuals, 18 U.S.C. § 922(g)(8), which prohibits persons subject to a domestic-violence restraining order from possessing firearms. 144 S. Ct. at 1894. In upholding the statute under *Bruen*'s second step, the Supreme Court relied on "two distinct legal regimes" from early America "that specifically addressed firearms violence": surety laws and "going armed" laws. *Id.* at 1899–901. Although neither of those regimes specifically targeted domestic-violence-like crimes, the Supreme Court relied on those historical sources to confirm the constitutionality of disarming individuals who "pose[] a clear threat of physical violence to another." *Id.* at 1901.

Given *Bruen*'s explicit abrogation of our prior means-end-scrutiny framework, we are no longer bound by *Stimmel*'s holding that § 922(g)(9) is constitutional. *See RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021) (explaining that intervening Supreme Court precedent may "mandate[] modification" of our otherwise binding precedent); *see also Williams*, 113 F.4th at 645–48 (holding that our pre-*Bruen* § 922(g)(1) precedent is no longer binding). Likewise, we are not bound by *Stimmel*'s "assum[ption]" about the historical scope of the Second Amendment right as it relates to domestic-violence misdemeanants. *See* 879 F.3d at 205 ("assuming, without deciding, that a domestic violence misdemeanant's Second Amendment rights remain intact to some degree" due to the government's "inconclusive" historical evidence); *cf. Wright v. Spaulding*, 939 F.3d 695, 701–02 (6th Cir. 2019). And to be sure, because *Rahimi* clarified the types of historical evidence that we may rely upon when considering a Second Amendment challenge, our historical analysis in *Stimmel*—where we faulted the government for not identifying any source "establishing that individuals who physically abused their family members or intimate partners were historically restricted from bearing arms," 879 F.3d at 205— was more narrow than now necessary.

Thus, we must consider with fresh eyes the constitutionality of § 922(g)(9) under *Bruen*'s two-step framework.

B.

First, we ask whether the Second Amendment's plain text covers Gailes's possession of firearms following his domestic-violence-misdemeanor convictions. The Second Amendment unquestionably protects Gailes's conduct (i.e., possession of pistols, as opposed to an unusually dangerous weapon, for example). But because the Second Amendment protects "the right of the people to keep and bear Arms," we must also ask whether domestic-violence misdemeanants are included in "the people" who possess that right. *See, e.g.*, *Worth v. Jacobson*, 108 F.4th 677, 688–92 (8th Cir. 2024).

*Rahimi* suggests the answer is yes. There, the Court skipped *Bruen*'s first step (plain text) and decided the case on the second (history and tradition). *Rahimi*, 144 S. Ct. at 1898–99. Perhaps it did so because "no one question[ed] that the law Mr. Rahimi challenge[d]"— prohibiting those subject to domestic-violence restraining orders from possessing guns—restricts conduct covered by the Second Amendment's text. *Id.* at 1907 (Gorsuch, J., concurring). But given that courts proceed to *Bruen*'s second step only if the Second Amendment covers the conduct at issue, we can deduce that possessing a firearm, even while subject to a domestic-violence restraining order, is protected conduct and that individuals subject to such orders are among "the people" who enjoy this right.

Regardless, our post-*Rahimi* caselaw confirms this reading. Felons, we have held, are a part of "the people" covered by the Second Amendment. *Williams*, 113 F.4th at 649–50; *United States v. Goins*, — F.4th —, 2024 WL 4441462, at *2 n.3 (6th Cir. 2024) (following *Williams*); *see also United States v. Gore*, — F.4th —, 2024 WL 4441472, at *4 (6th Cir. 2024) (holding that individuals under indictment for a felony are a part of "the people"). This conclusion is due to *Heller*'s direction that "'the people' unambiguously refers to all members of the political community, not an unspecified subset." *Williams*, 113 F.4th at 649 (quoting *Heller*, 554 U.S. at 580). Thus, the Second Amendment's protections belong presumptively to "all Americans," regardless of whether they have been convicted of a felony. *Id.* (quoting *Heller*, 554 U.S. at 581).

If people subject to a domestic-violence restraining order and felons are among "the people" protected by the Second Amendment, so are domestic-violence misdemeanants like Gailes. Indeed, the government conceded at oral argument that Gailes is a member of "the people" and therefore prevails under *Bruen*'s first step. Accordingly, domestic-violence misdemeanants are still "members of the political community" despite their convictions, *see id.*, and thus, the Second Amendment presumptively protects their right to possess firearms, *see Bruen*, 597 U.S. at 17. "[T]heir status," however, "may justify limitations" on their individual right to bear arms. *Gore*, 2024 WL 4441472, at *4 (citation and emphasis omitted). Given that § 922(g)(9) constrains that right, we turn to *Bruen*'s second step.

## C.

We next ask whether the government has demonstrated that § 922(g)(9) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. If it has, "[o]nly then may [we] conclude that [Gailes's] conduct falls outside the Second Amendment's unqualified command." *Id.* at 24 (internal quotation marks omitted). In this regard, the government must identify only a "historical analogue," not a "historical twin," to the challenged regulation. *Rahimi*, 144 S. Ct. at 1902–03. And it can rely on "relevantly similar" historical precursors even if they do not "precisely match" the regulation at issue. *Id.* at 1898 (citation omitted). "Why and how the regulation burdens the right [to bear arms] are central to this inquiry." *Id.* Applying the rationales in *Rahimi* and *Williams*, we hold that § 922(g)(9) passes constitutional muster.

## 1.

Domestic-violence convictions generally involve some sort of physical force. *See, e.g.*, Tenn. Code §§ 39-13-101, 39-13-111 (prohibiting the intentional, reckless, or knowing causing of bodily injury, reasonable fear of imminent bodily injury, or offensive physical contact with a "domestic abuse victim"); Ky. Rev. Stat. § 403.720(2)(a) (defining "domestic violence and abuse" as "[p]hysical injury, serious physical injury, stalking, sexual assault, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual assault, strangulation, or assault between family members or members of an unmarried couple");

Mich. Comp. Laws § 750.81(2) (prohibiting the assault or battery of one's spouse or ex-spouse, romantic partner, child's parent, or resident or former resident of one's home); Ohio Rev. Code § 2919.25 (prohibiting the knowing or reckless physical harm of a family or household member); *see also* 18 U.S.C. § 921(a)(33)(A)(ii) (providing that a "misdemeanor crime of domestic violence" involves "the use or attempted use of physical force, or the threatened use of a deadly weapon").

When the presence of a gun accompanies the use of physical force, the likelihood that abuse turns to homicide greatly increases. *See Castleman*, 572 U.S. at 159–60; *see also Rahimi*, 144 S. Ct. at 1906 (Sotomayor, J., concurring) ("[O]ver 70 people [are] shot and killed by an intimate partner each month in the United States."). And domestic abusers with firearms are dangerous not only to their direct victims, but also to accompanying loved ones, bystanders, and responding law enforcement officers. *Rahimi*, 144 S. Ct. at 1906 (Sotomayor, J., concurring); *see also Stimmel*, 879 F.3d at 210 ("[A]pproximately 10% of non-accidental law enforcement officer fatalities in the line of duty [in 2016] occurred while the officers were responding to domestic disturbance calls."). It is no surprise then that Congress sought to deprive people with domestic-violence convictions from possessing firearms. Following the rationales of *Rahimi* and *Williams*, we conclude that there is historical support for doing so.

2.

*Rahimi* held that people subject to domestic-violence restraining orders may be categorically disarmed without violating the Second Amendment. In ruling that § 922(g)(8) survives the *Bruen* test, the Court focused its analysis on two statutory regimes: surety laws and "going armed" laws. *Rahimi*, 144 S. Ct. at 1899–1901. Surety laws were a "form of preventive justice," which required people suspected of "future misbehavior" to post a bond; if a person broke the peace, then that person would forfeit the bond. *Id.* at 1899–900 (citation omitted). And going armed laws "punish[ed] those who had menaced others with firearms" by requiring such individuals to forfeit their arms and face imprisonment. *Id.* at 1900–01. Of course, these regimes did not specifically prevent suspected domestic-violence offenders from using firearms. *See id.* at 1903 (rejecting the necessity of a "historical twin"); *see also id.* at 1900, 1905 (Sotomayor, J., concurring) ("Given the fact that the law at the founding was more likely to

protect husbands who abused their spouses than offer some measure of accountability it is no surprise that that generation did not have an equivalent to § 922(g)(8)." (internal citation omitted)).  Indeed, the only connection that either of these regimes had with domestic violence was that sureties could be demanded by one spouse against the other.  *See id.* at 1900 (majority opinion).  Yet, the Supreme Court found them to be sufficient historical analogues to § 922(g)(8) under *Bruen* because they are "relevantly similar" enough to "apply[] faithfully the balance struck by the founding generation to modern circumstances."  *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 29 & n.7).  Therefore, the Court stated, "[t]aken together, the surety and going armed laws confirm what common sense suggests:  When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  *Id.* at 1901.

Extending *Rahimi*'s historical analysis and logic, we recently held in *Williams* that convicted felons may be categorically disarmed under § 922(g)(1) based on our Nation's history and tradition of firearm regulation.  113 F.4th at 650.  Namely, we relied upon general, historical analogues—none that specifically targeted felons' right to bear arms—to affirm § 922(g)(1)'s constitutionality under the second prong of the *Bruen* analysis.  *See id.* at 650–57  Thus, we held that "§ 922(g)(1) is constitutional on its face," as well as in "most applications," so long as allegedly dangerous disarmed people have "an opportunity to make an individualized showing that [they are] not actually dangerous."  *Id.* at 657, 662.

Taken together, *Rahimi* and *Williams* evince that our history and tradition of firearm regulation support § 922(g)(9).  Although § 922(g)(9) "is by no means identical" to the historical sources above or a founding-era regime, "it does not need to be."  *Rahimi*, 144 S. Ct. at 1901.  The historical sources cited in *Rahimi* and *Williams* establish the constitutionality of modern firearms regulations targeting those who "pose[] a clear threat of physical violence to another."  *Rahimi*, 144 S. Ct. at 1901; *cf. Williams*, 113 F.4th at 657.  Section 922(g)(9), which categorically disarms individuals with valid, domestic-violence convictions, fits well within this historical tradition.

3.

Gailes resists, arguing that "the government has not uncovered what would be the best evidence of a historical tradition supporting Section 922(g)(9): a founding-era regulation that banned individuals with prior criminal convictions for domestic violence from ever possessing firearms." But such evidence would be a "historical twin," which is not necessary for the government to satisfy its burden of finding a "historical *analogue.*" *Bruen*, 597 U.S. at 30; *Rahimi*, 144 S. Ct. at 1903. As demonstrated by *Rahimi*'s historical analysis (again, which did not expressly discover domestic-violence-related regulations), the government's evidence here shows that § 922(g)(9) is "'relevantly similar' to laws that our tradition is understood to permit." 144 S. Ct. at 1898 (citation omitted).

Nor do Gailes's attempts to distinguish *Rahimi* persuade. True, *Rahimi* considered the constitutionality of disarming individuals subject to a domestic-violence restraining order, not individuals who have a domestic-violence-misdemeanor conviction. But if someone who is merely accused of committing domestic violence can be disarmed without offending the Second Amendment, then *a fortiori* someone with a valid conviction can also be disarmed. Even Justice Thomas's dissenting opinion in *Rahimi*, which took issue with § 922(g)(8)'s ability to disarm people without a criminal conviction, noted how § 922(g)(9) does not suffer that problem. *See id.* at 1930 (Thomas, J., dissenting).

Gailes further emphasizes that *Rahimi* upheld the disarmament of individuals who *presently* pose a threat of physical violence, not individuals who *previously* posed such a threat. But someone who posed a risk in the past does not mean they no longer do so. Scholars agree that—and as Gailes himself demonstrates—the recidivism rate for domestic-violence offenders is high. *See, e.g.*, Martin Rettenberger & Reinhard Eher, *Actuarial Risk Assessment in Sexually Motivated Intimate-Partner Violence*, 37 L. & Hum. Behav. 75, 77 (2013); Brendan Horan, Comment, *The Ball is in Whose Court? Rhode Island's Need for an Integrated Domestic Violence Court*, 26 Rogers Williams U. L. Rev. 738, 750 (2021); Viet Nguyen & Mia Bird, *Tailoring Domestic Violence Programs to Reduce Recidivism*, Pub. Pol'y Inst. of Cal. (June 12, 2018), https://www.ppic.org/blog/tailoring-domestic-violence-programs-to-reduce-recidivism/ [https://perma.cc/MRT7-C2MF]; *see also Stimmel*, 879 F.3d at 208–09 (discussing recidivism

data); *United States v. Skoien*, 614 F.3d 638, 644 (7th Cir. 2010) (en banc) ("[T]he recidivism rate [for domestic-violence offenders] is high, implying that there are substantial benefits in keeping the most deadly weapons out of the hands of domestic abusers."). Moreover, (again, as shown by Gailes's conduct), "[d]omestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *Castleman*, 572 U.S. at 160 (internal citations omitted).

The fact that the *Rahimi* Court addressed § 922(g)(8)'s temporary firearm ban, as opposed to a permanent ban, does not change our conclusion. *See* 144 S. Ct. at 1902. That is because in *Williams*, we upheld a permanent firearm ban. *See* 113 F.4th at 662–63 (upholding 18 U.S.C. § 922(g)(1)). And, both Williams and Gailes were convicted—in accordance with due-process principles—of their predicate crimes prior to disarmament. Also, the purported permanent ban in § 922(g)(9) may not always be so, given that domestic-violence misdemeanants "can (1) petition to set aside their conviction; (2) seek a pardon; (3) have their conviction expunged; or (4) have their civil rights fully restored." *Stimmel*, 879 F.3d at 207 (citing 18 U.S.C. § 921(a)(33)(B)(ii)).

Finally, Gailes contends that some predicate convictions for § 922(g)(9) might not involve physical threats or violence because the definition of "force" under the statute encompasses offenses that merely involve offensive touching. *See Castleman*, 572 U.S. at 162–63. We need not mull over all the predicate convictions that could subject one to disarmament under § 922(g)(9) because Gailes raises only a facial challenge to the statute. *See Gore*, 2024 WL 4441472, at *6. Because there are numerous domestic-violence misdemeanors that do involve violent, physical contact, our Nation's history and tradition support our conclusion that § 922(g)(9) "is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898.

## IV.

While the "why and how" behind our regulation of firearms may have evolved, our Nation has always taken measures to prevent violence by people with firearms who pose a clear threat to others. *See id.* The Second Amendment demands only that § 922(g)(9) be consistent with our country's "historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 17.

And, as chronicled in *Rahimi* and *Williams*, our history "confirm[s] what common sense suggests":  people who were previously convicted of a domestic-violence misdemeanor fall squarely within the category of people who pose a clear threat to the physical safety of others. *See Rahimi*, 144 S. Ct. at 1901.  We therefore hold that 18 U.S.C. § 922(g)(9) is facially constitutional, "consistent with the Second Amendment." *See id.* at 1896.

For these reasons, we affirm the judgment of the district court and the denial of Gailes's motion to dismiss the indictment.