RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TERRENCE WAYNE VANOCHTEN,

*Defendant-Appellant*.

No. 23-1901

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cr-00029-1—Paul Lewis Maloney, District Judge.

Argued: May 8, 2025

Decided and Filed: August 8, 2025

Before: CLAY, THAPAR, and READLER, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Pedro Celis, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. John J. Schoettle, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Sean R. Tilton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Grand Rapids, Michigan, for Appellant. John J. Schoettle, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

─────────────

## OPINION

─────────────

READLER, Circuit Judge. Section 922(g)(3) of Title 18 prohibits unlawful drug users from possessing firearms. 18 U.S.C. § 922(g)(3). Echoing the sentiment that drug users in possession of firearms raise heightened safety concerns, the Sentencing Guidelines instruct

district courts to increase a defendant's base offense level in firearm possession cases if he is a "person described" in § 922(g)(3)—in other words, if he is an unlawful user of controlled substances and possesses firearms.  U.S. Sent'g Guidelines Manual § 2K2.1(a)(4)(B) (U.S. Sent'g Comm'n 2024) (hereinafter Guidelines); *id.* cmt. n.3.

In this case, Terrence Wayne VanOchten pleaded guilty to possessing three unregistered firearms (pipe bombs).  Over VanOchten's opposition, the district court increased his base offense level on the grounds that he is a "person described" in § 922(g)(3).  *Id.* cmt. n.3.  That leaves us to resolve the constitutional question at the heart of VanOchten's objection:  whether § 922(g)(3) may be enforced against him, consistent with the Second Amendment.  We agree with the government that it can, and thus affirm the district court's sentence.

I.

Sheriff's deputies in Kalkaska County (Michigan) received word that a man was shooting a rifle in his backyard.  Arriving at the suspect's home, deputies discovered Terrence VanOchten standing in his garage, holding a Glock pistol.  VanOchten told the deputies what had happened: using a rifle, he fired on some birds in his backyard.

In the moments that followed, the deputies learned several things.  One, VanOchten owned (at least) two Armalite rifles.  Two, he had been shooting one of them in the direction of a propane tank in his backyard, aiming, he claimed, for a flock of birds.  Three, VanOchten was drunk.  He smelled strongly of alcohol, so the deputies asked him to take a field sobriety test, which he failed; several hours later, after the deputies got a warrant for his blood, VanOchten had a blood alcohol level of .157.  Four, VanOchten was high on marijuana.  A "marijuana pipe still warm to the touch" rested "on a work bench."  PSR, R.38, PageID 197.  VanOchten later told the deputies he used marijuana regularly, "smok[ing] a bowl" "every three nights."  *Id.* at 199.

Taken together, these facts painted a fair picture of what had happened before the deputies arrived on scene—VanOchten was "shooting" a rifle "in the direction of a propane tank in a residential neighborhood" while "drunk and high."  Sent'g Hr'g Tr., R.48, PageID 319.  The deputies arrested VanOchten.  An investigation ensued, with the deputies executing two search

warrants for VanOchten's home.   During the searches, they found several semiautomatic firearms, three pistols, three pipe bombs, and a large cache of ammunition.

The deputies contacted the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) about the pipe bombs, which, as VanOchten explained, he built himself.  As the ATF would discover, each one had "black powder" and "a hole drilled in one of the end caps for placement of a fuse."  PSR, R.38, PageID 198.  When the ATF tested the pipe bombs, their "powder and fuses rapidly burned as designed."  Plea Agreement, R.32, PageID 160.  That meant they worked:  "if detonated, the devices could kill, maim, or injure people, and destroy property, by creating a shock wave and by throwing fragmented parts of metal pipe outward as 'shrapnel.'"  *Id.*

VanOchten's legal problems mounted.  He earned a conviction under state law for possessing a firearm while intoxicated and received six months of probation.  Federal charges would prove more problematic.  A grand jury charged VanOchten with possessing three unregistered firearms (pipe bombs), in violation of 26 U.S.C. §§ 5861(d), 5841, and 5871.  (The term "firearm" includes "a destructive device," which describes the pipe bombs VanOchten possessed.  *Id.* § 5845(a)(8).)  He pleaded guilty to the charge.

In its pre-sentence report, the probation office recommended a base offense level of 20 under § 2K2.1(a)(4)(B) of the Sentencing Guidelines.  That provision sets a base offense level of 20 if the defendant's "offense involved" a "firearm that is described in 26 U.S.C. § 5845(a)" and the defendant "was a prohibited person at the time" he "committed the instant offense."  Guidelines, *supra*, § 2K2.1(a)(4)(B).   Beginning with the threshold inquiry, whether VanOchten's "offense"—possessing destructive devices—"involved" a firearm "described in 26 U.S.C. § 5845(a)," the probation office concluded that it did because § 5845(a) defines the word "firearm" to include "a destructive device."  26 U.S.C. § 5845(a)(8).

That left a second question:  Was VanOchten "a prohibited person at the time" he "committed the instant offense"?  The probation office concluded that he was.  By way of background, although § 2K2.1(a)(4)(B) directs district courts to increase a defendant's base offense level in firearm possession cases based in part on whether the defendant is a "prohibited

person," the guideline itself leaves this phrase undefined. Instead, the Sentencing Commission defined "prohibited person" in commentary accompanying § 2K2.1(a)(4)(B). In particular, Application Note 3 defines a "prohibited person" as someone "described in 18 U.S.C. § 922(g)." Guidelines, *supra*, § 2K2.1(a)(4)(B) cmt. n.3. VanOchten was a "prohibited person," the probation office found, because he fell within the heartland of a person "described in . . . § 922(g)"—specifically § 922(g)(3). Section 922(g)(3) prohibits someone "who is an unlawful user of" "any controlled substance" from "possess[ing]" a "firearm" "in or affecting commerce." 18 U.S.C. § 922(g)(3). Because VanOchten regularly and repeatedly used marijuana (an unlawful controlled substance under federal law), and because he possessed pistols and rifles (firearms), he was a person described in § 922(g)(3), and thus a "prohibited person" within the meaning of § 2K2.1(a)(4)(B). *United States v. Burchard*, 580 F.3d 341, 352 (6th Cir. 2009). So, beginning with a base offense level of 20, and adding in other adjustments, VanOchten faced a total offense level of 23, which, when combined with his criminal history category (I), resulted in a sentencing range of 46 to 57 months.

VanOchten objected to the pre-sentence report on the grounds that § 922(g)(3) could not be applied to him consistent with the Second Amendment. To his mind, the Second Amendment, historically understood, prevents Congress from disarming marijuana users. Not so, responded the government, at least as to marijuana users who present a risk of future harm to others if armed. And that label, the government added, fairly described VanOchten—a marijuana user, who "was drunk, high, and shooting at birds" "in the direction of a propane tank, in a residential neighborhood." Gov't's Sent'g Mem., R.41, PageID 273. In other words, the government explained, VanOchten was "high and drunk at the time he was using a gun in a very unsafe way." Sent'g Hr'g Tr., R.48, PageID 315–16. Enforcing § 922(g)(3) against VanOchten, the government concluded, would be consistent with the historical principle of "taking guns away from dangerous people." *Id.* at 319.

At sentencing, the district court sided with the government. Section 922(g)(3), the court explained, could be applied to VanOchten consistent with the Second Amendment because he "represented a threat to the public." *Id.* at 371. Adopting the pre-sentence report's sentencing

recommendations in full, the court sentenced VanOchten to 52 months in prison, which fell within his recommended range of 46 to 57 months. VanOchten appealed.

II.

VanOchten argues that the district court improperly calculated his base offense level. The court, remember, gave him a base offense level of 20 after concluding that he was a "person described" in § 922(g)(3). Guidelines*, supra*, § 2K2.1(a)(4)(B) cmt. n.3. VanOchten does not dispute that he is such a person: He regularly uses marijuana, an illegal substance under federal law, and possesses several guns. *Burchard*, 580 F.3d at 352. VanOchten, instead, renews the same objection he made in the district court: Section 922(g)(3) cannot be applied to him consistent with the Second Amendment. This argument amounts to a procedural reasonableness challenge to his sentence. We ordinarily review this type of challenge for an abuse of discretion. Under that standard, we review the district court's factual findings for clear error and its legal conclusions with fresh eyes. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). All of this prompts the only question in this appeal: Is § 922(g)(3) constitutional as applied to VanOchten?

When considering an as-applied challenge to a firearm regulation, we make two inquiries: One, does the Second Amendment's plain text cover the claimant's proposed course of conduct? If so, two, can the government, consistent with the principles that underpin our nation's regulatory tradition, justify applying the regulation to him? *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1897–98 (2024).

Our recent decision in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), all but resolves these questions in favor of the government in this case. *Williams* held that 18 U.S.C. § 922(g)(1), a statutory companion to § 922(g)(3), one that prohibits felons from possessing firearms, is constitutional as applied to "dangerous individuals." *Id.* at 662. In keeping with *Bruen*'s two-step inquiry, *Williams* first considered whether the Second Amendment covered the claimant's (the felon's) proposed course of conduct. It did. The felon, we explained, was a member of "the people" protected by the Second Amendment, and § 922(g)(1), by prohibiting

him from possessing firearms, burdened his right to keep arms. *Id.* at 649–50. *Williams* thus turned to the second inquiry, whether the government had shown that § 922(g)(1) could be applied consistent with the historical contours of the Second Amendment. It had. We agreed that, based upon historical analogues, Congress "may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't." *Id.* at 661–62. And Congress had in fact done so in § 922(g)(1), disarming felons as a group because it judged them to be dangerous. *Id.* at 662. Thus, we concluded, § 922(g)(1) is constitutional as it applies to "dangerous individuals." *Id.*

These principles suffice to resolve this case. Congress used class-based legislation to disarm drug users through § 922(g)(3) because it judged them to be dangerous. Under *Williams*, that is permissible—"so long as each" drug user in the disarmed group "has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663. Accordingly, § 922(g)(3)—like § 922(g)(1)—can be constitutionally applied to "dangerous individuals." *Id.* at 662. And here, for reasons we will explain, VanOchten is dangerous.

A. We begin with *Bruen*'s first inquiry: whether the Second Amendment covers the claimant's proposed course of conduct. *Bruen*, 142 S. Ct. at 2126. Relevant here is the constitutional guarantee that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. With this command in mind, we ask whether a member of "the people" is attempting to "keep [or] bear" an "Arm[]" and whether a government regulation "infringe[s]" on his "right" to do so. *Id.*; *see also Bruen*, 142 S. Ct. at 2134; *Williams*, 113 F.4th at 648–50.

VanOchten easily satisfies *Bruen*'s first step. To begin, as an American citizen, VanOchten is one of "the people" who enjoys Second Amendment rights. *District of Columbia v. Heller*, 554 U.S. 570, 580–81 (2008). *Heller* interpreted the phrase "the people" in the Second Amendment exactly that way—referring to (at least) "all Americans." *Id.* at 581. In that respect, the phrase "the people," drafted at a high level of generality, draws no "distinction" on its face among citizens. *Williams*, 113 F.4th at 649. So VanOchten remains a member of "the people" protected by the Second Amendment, despite his marijuana use. *Id.* We are aware of no historical evidence suggesting that Americans who use illegal drugs are categorically excluded

from "the people" to whom the Second Amendment refers. That conclusion, it bears adding, is consistent with our precedent. American felons, for example, remain members of "the people," despite their felony convictions. *Id.* So too are Americans convicted of state-law domestic-violence misdemeanors. *United States v. Gailes*, 118 F.4th 822, 826 (6th Cir. 2024).

That leads to the second half of *Bruen*'s threshold inquiry: does the Second Amendment cover VanOchten's proposed course of conduct? *Bruen*, 142 S. Ct. at 2126. In other words, does § 922(g)(3) "infringe" on his "right" to "keep and bear Arms"? Again, yes. VanOchten invokes the privilege (right) to possess (keep) firearms (Arms) in his home. That tracks the core Second Amendment guarantee as understood by the Supreme Court. *Heller*, 554 U.S. at 635. And § 922(g)(3) infringes on that right because it prohibits VanOchten from possessing firearms. *Williams*, 113 F.4th at 649–50 (explaining that § 922(g)(1) "burdens" a felon's "right" to "possess a gun" and thus infringed on his proposed course of conduct).

B. Because the Second Amendment's plain text covers VanOchten's proposed course of conduct, we turn to *Bruen*'s second inquiry: whether enforcing § 922(g)(3) against VanOchten is consistent with our nation's historical tradition of firearms regulation. *Bruen*, 142 S. Ct. 2129–30; *Rahimi*, 144 S. Ct. at 1898. To demonstrate as much, the government must reason by analogy and establish that § 922(g)(3) is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

Taking up that cause, the government contends that the historical principle of disarming dangerous people justifies applying § 922(g)(3) to VanOchten. So much so, the government adds, that this principle justifies § 922(g)(3) *in all applications*. According to the government, Congress may, consistent with the Second Amendment's historical scope, categorically disarm classes of individuals it judges to present a special risk of danger to the public. The government advances two basic historical arguments in support of this legislative power. First, it points out that founding-era legislatures disarmed classes of individuals they judged to present a risk of danger to the public—specifically, loyalists and Catholics. Second, it says that founding-era legislatures authorized government officials (usually, judicial officers) to disarm individuals, whom the officials found had engaged in dangerous behavior. From this history, the government concludes, Congress may categorically disarm classes of people it believes are dangerous. In the

government's words, because "Congress" can "disarm unlawful drug users as a group," our "Court's consideration of VanOchten's challenge" "should end." Appellee Br. 21.

This argument has a major flaw: *Williams* rejected its premise. There, we analyzed extensively the power of Congress to disarm entire groups of people based on its judgment that they were dangerous. We held that Congress could not categorically disarm entire classes of people, like felons, simply because it judged them to present a threat to public safety. *Williams*, 113 F.4th at 660–62. Our historical analysis extracted the following rule: "when the legislature disarms on a class-wide basis, individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization." *Id.* at 661. In other words, "governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't." *Id.* at 661–62. For VanOchten, then, the government cannot strip him of his right to bear arms simply because he falls within a class of people Congress has deemed dangerous. Instead, he must have the opportunity to demonstrate he is not dangerous.

As a fallback, the government contends that, at the very least, Congress may, consistent with the Second Amendment's historical scope, disarm an illegal drug user whose behavior shows that he is dangerous. This time, we agree.

Back to *Williams*, where we examined the government's power to disarm dangerous people. At stake there was § 922(g)(1)—the felon-in-possession provision. We held that § 922(g)(1) can be applied in many cases consistent with past limitations on the ability of dangerous people to possess firearms. At various points in our historical pedigree, including at the founding and even decades earlier, our government (and before that, the British) enacted laws limiting the ability of people deemed dangerous by the government to keep arms—either individually or as a class. For example, the Militia Act of 1662 authorized British officers to disarm persons determined to be "dangerous to the Peace of the Kingdom." *Id.* at 651 (quoting 14 Car. 2, c. 3, § 13 (1662)). England and American governments also had unwritten and written "going-armed" offenses, which disarmed anyone who carried his firearms in a manner that caused terror to the people. *Id.* at 650. And some founding-era legislatures disarmed entire groups of people, like Catholics, unless they swore an oath of loyalty to the government. *Id.* at

651. From this history, we derived the following rule: "legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663.

It follows that § 922(g)(3) can be applied to dangerous drug users consistent with the Second Amendment. As *Williams* makes clear, Congress may use class-based legislation to designate "whole classes" of individuals "as presumptively dangerous." *Id.* at 657. That is precisely what Congress did in enacting § 922(g)(3). Through that provision, "Congress classified" drug users as "potentially" "dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976). Section 922(g)(3), in other words, reflects a congressional attempt to "keep guns out of the hands of presumptively risky people." *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (per curiam). That said, when Congress disarms "groups of people" it "believes to be dangerous," (here, illegal drug users) it remains the case that "each member of that disarmed group" must have the "opportunity to make an individualized showing that he himself is not actually dangerous." *Williams*, 113 F.4th at 663.

In a series of cases, both the Fifth and Eighth Circuits have reached a similar conclusion. Start with the Eighth Circuit and its decision in *United States v. Veasley*, 98 F.4th 906 (8th Cir. 2024). There, the Eighth Circuit rejected a facial challenge to § 922(g)(3). As the appeals court explained, § 922(g)(3) could be applied to dangerous drug users consistent with the principles undergirding founding-era going-armed offenses. Going-armed laws disarmed individuals who took "up arms to terrify the people." *Id.* at 916. Those laws, in other words, disarmed people who had misused their firearms "in a way that terrorized others." *Id.* at 917. And § 922(g)(3), as applied to dangerous people, is similar to the going-armed laws, the Eighth Circuit added, in both "why" and "how" it burdens the right to keep arms. It shares a comparable "why" with going-armed offenses because it prevents individuals who pose a threat to others from having firearms. *Id.* And it shares a comparable "how"—temporary disarmament. *Id.* For those reasons, the Eighth Circuit concluded, § 922(g)(3) can be applied to drug users in possession of firearms who had engaged in "dangerous behavior" or "dangerous conduct." *Id.* To be sure, the appeals court cautioned, not all drug users could be disarmed under § 922(g)(3). "Consider the 80-year-old

grandmother who uses marijuana for a chronic medical condition and keeps a pistol tucked away for her own safety." *Id.* at 917–18. She will likely not "pose a danger or induce terror in others"—but that is the stuff of "as-applied challenge[s]." *Id.* at 918.

In *United States v. Cooper*, 127 F.4th 1092 (8th Cir. 2025), the Eighth Circuit later clarified how it believes courts should resolve as-applied challenges to § 922(g)(3). *Cooper* began by reiterating that founding-era going-armed offenses justified applying § 922(g)(3) to *some* drug users. Which ones? Two kinds. First, following the Supreme Court's direction in *Rahimi*—which was decided after *Veasley*—§ 922(g)(3) could be applied to drug users who present a "credible threat" to others. *Id.* at 1096 (quoting *Rahimi*, 144 S. Ct. at 1889). Second, in light of *Veasley*, § 922(g)(3) could be applied to drug users who had "engage[d] in 'terrifying conduct.'" *Id.* (quoting *Veasley*, 98 F.4th at 917). All of this, the Eighth Circuit explained, helps "frame" the "relevant questions" for resolving "as-applied challenge[s]" to § 922(g)(3): Does the defendant "pose a credible threat to the physical safety of others with a firearm," or did he "induce terror"? *Id.* at 1096 (quotations omitted). If the answer to either question is "yes," the government may, consistent with the Second Amendment, prosecute a drug user in possession of firearms under § 922(g)(3). *Id.*

*Veasley* and *Cooper*, it bears emphasizing, are consistent with *Williams*'s core holding: Congress can use class-based legislation to disarm entire groups of people (here, drug users), so long as members of the disarmed groups have the chance to prove that they are not actually dangerous.

The Fifth Circuit, beginning with *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), hewed to this general path, albeit with some explanation required. There, the Fifth Circuit held that the government could not prosecute a non-violent marijuana user under § 922(g)(3) consistent with the Second Amendment. *Id.* at 283. The appeals court began by explaining that the historical principle of disarming dangerous people does not justify stripping all marijuana users of their right to keep and bear arms. *Id.* at 278–79. That is consistent with *Williams*, where we held that Congress could not categorically disarm entire groups of people without giving them a chance to show they do not fit within the class-wide generalization. But "[a]s applied," the Fifth Circuit added, "the government has not shown how [the defendant's] marijuana use

predisposes her to armed conflict or that she has a history of drug-related violence." *Id.* at 279. This as-applied holding left open a question in the Fifth Circuit: Can a drug user only be disarmed under § 922(g)(3)—based on the dangerousness principle—if his drug use *predisposes* him to dangerous behavior?

A later Fifth Circuit decision, *United States v. Daniels*, 124 F.4th 967 (5th Cir. 2025), suggests the answer is "no." Again, *Connelly* indicated that a drug user could be disarmed under § 922(g)(3) based on the dangerousness principle only if his drug use predisposed him to armed violence. *Connelly*, 117 F.4th at 279. *Daniels*, however, made clear that *Connelly* "does not foreclose the government from attempting to reformulate its dangerousness argument in the context of different as-applied challenges moving forward." *Daniels*, 124 F.4th at 977. And, the Fifth Circuit added, the analysis for as-applied challenges could vary "depending" on the "defendant's *history* and *conduct*." *Id.* (emphasis added). Taking all of this together, drug users could be disarmed under § 922(g)(3) if they were dangerous because of their particular characteristics—gleaned from their criminal history and other relevant information. *Id.* at n.11.

In sum, a straightforward application of *Williams* demonstrates that § 922(g)(3) is constitutional as applied to dangerous individuals.

C. That tees up the ultimate question in this case: Is VanOchten himself dangerous? At the outset, it is worth reflecting on what we mean by "dangerous." As *Williams* explained, the relevant principle pulled from founding-era history is that government may limit the right to keep arms of persons who presently pose a clear risk of future harm or violence toward others if they were to possess a gun. *Williams*, 113 F.4th at 650–657; *Rahimi*, 144 S. Ct. at 1901–02; *see also Gailes*, 118 F.4th at 828 (explaining that the "historical sources cited in *Rahimi* and *Williams* establish the constitutionality of modern firearms regulations targeting those 'who pose[] a clear threat of physical violence to another'") (alteration in original) (quotation omitted). Section 922(g)(3) can be applied consistent with these principles: The government can disarm an illegal drug user who presently poses a clear risk to others if armed. In determining whether a person poses a clear risk of future harm, we can look at his "criminal record." *Williams*, 113 F.4th at 659. Why? Because the specific details of a person's past crimes help us determine whether he poses a clear threat to the public today. *Id.* at 659–60. A few general questions will help frame

the inquiry. Does the person have a history of violent conduct—murder, assault, robbery, for example? *Id.* at 658. Likewise, does he have a history of committing crimes that inherently pose a significant threat of danger to others—drug trafficking or burglary, for example? *Id.* at 659.

Determining whether a drug user is dangerous and thus can be disarmed under § 922(g)(3) will be easy in some cases and hard in others. The "80-year-old grandmother who uses marijuana for a chronic medical condition and keeps a pistol tucked away for her own safety" is not dangerous. *Veasley*, 98 F.4th at 917–18. The 31-year-old member of a criminal gang who uses methamphetamine and has recently committed violent assaults and armed robbery, by contrast, is dangerous. *Williams*, 113 F.4th 658. We trust that courts "like the officials of old" will focus on "each individual's specific characteristics" and make good faith judgments accordingly. *Id.* at 657.

This case falls on the easy side of the line. In assessing whether VanOchten is dangerous, we need only examine his "criminal record." *Id.* at 659. Remember, he earned a state law conviction for his conduct on the day he was arrested by Michigan deputies. On that day, he "was shooting" a rifle "in the direction of a propane tank in a residential neighborhood" while "drunk and high." Sent'g Hr'g Tr., R.48, PageID 319. As this event shows, he misused his gun in a way that could "have caused a major explosion," injuring himself or harming the person or property of another. *Id.* at 348. His misconduct posed "a significant threat of danger" to himself and others. *Williams*, 113 F.4th at 659. From this incident alone, VanOchten has demonstrated—as the district court found—that he presents a clear "threat to the public." Sent'g Hr'g Tr., R.48, PageID 371. Because the government can apply § 922(g)(3) to VanOchten consistent with the Second Amendment, the district court properly gave him a base offense level of 20 under § 2K2.1(a)(4)(B) of the Sentencing Guidelines. VanOchten's sentence has no procedural defect.

D. VanOchten offers two arguments in response.

First, VanOchten argues that Congress has no power to categorically disarm marijuana users. But under *Williams*, Congress may disarm "groups of people" it "believes to be dangerous" if "each member of that disarmed group" has the "opportunity to make an

individualized showing that he himself is not actually dangerous." *Williams*, 113 F.4th at 663. Here, Congress has disarmed illegal drug users; and, as explained, VanOchten is dangerous.

Second, VanOchten asserts that § 922(g)(3) may be applied to dangerous drug users only if they are dangerous *because of their drug use*. He begins by conceding that § 922(g)(3) is constitutional as applied to dangerous drug users. Appellant Br. 21. He then assumes "for the sake of argument" that he is dangerous. *Id.* But, he says, he is not dangerous "because of his occasional use of marijuana." *Id.* In other words, his danger is not *tied*, or *related*, to his drug use. For example, nothing "in the record," VanOchten presses, demonstrates that he "consumed marijuana before the shooting incident." *Id.* He claims, rather, that he smoked marijuana after the shooting incident, but before the deputies arrived. It follows, he says, that the record does not support that his marijuana use "predisposes" him to act in dangerous ways. *Id.* (quotation omitted).

This argument has a few problems. To begin, the historical principle of disarming dangerous people, a foundational aspect of the Second Amendment, permits the government to disarm those found dangerous by the government—either individually or as a class. *Williams*, 113 F.4th at 650–57. When the government uses class-wide legislation to disarm entire groups of people judged to be dangerous, members of those groups must be allowed to show that they are not actually dangerous. *Id.* at 657. This historical principle derived from *Williams* does not require the government to tie someone's danger to his membership in a disarmed group. Instead, when assessing an individual's dangerousness, courts focus on the defendant's "specific characteristics" gleaned from his criminal record and/or other judicially noticeable information. *Id.* And here, VanOchten's criminal record—in particular, his misconduct leading up to his arrest—shows that he presents a clear threat to the public if armed.

In arguing that a dangerous drug user can be disarmed under § 922(g)(3) only if he is dangerous because of his drug use, VanOchten draws significance from a single sentence in the Fifth Circuit's opinion in *Connelly*. There, remember, the Fifth Circuit said that the government could not invoke the dangerousness principle to enforce § 922(g)(3) against a non-violent drug user because "the government ha[d] not shown how [the defendant's] marijuana use predisposes her to armed conflict or that she has a history of drug-related violence." *Connelly*, 117 F.4th at

279. To the extent *Connelly* suggests that § 922(g)(3) can be applied to someone only if his drug use predisposes him to violence, that appears to be incorrect. As explained, the government can disarm someone who—based on his characteristics—is dangerous. *E.g.*, *Williams*, 113 F.4th at 662. The Fifth Circuit, it bears adding, has clarified *Connelly*'s statement about predisposition. In *Daniels*, remember, the appeals court explained that *Connelly* did not prevent the government from arguing in future cases that a defendant is dangerous for purposes of § 922(g)(3) based on his criminal "*history and conduct*." *Daniels*, 124 F.4th at 977 (emphasis added). And here, as described, VanOchten is dangerous because of his misconduct leading up to his arrest at his home.

Even if VanOchten were correct that § 922(g)(3) can be applied based on the dangerousness principle only when the drug user is dangerous because of his drug use, VanOchten still has not demonstrated that he is not dangerous. *Williams*, 113 F.4th at 657. His argument proceeds on the core assumption that he was not impaired at the time he opened fire on birds in his backyard. But the district court found that he was high when he misused his rifle, meaning his marijuana use is tied to his dangerous behavior. At sentencing, the district court held that § 922(g)(3) could be applied to VanOchten "for the reasons stated in the government's papers." Sent'g Hr'g Tr., R.48, PageID 348. And the government's papers clearly took the position that VanOchten was high at the time of the shooting. *See* Gov't's Sent'g Mem., R.41, PageID 267 (arguing that VanOchten was "high at the time of the offense"); *id.* at 273 (arguing that VanOchten was "high at the time of the offense"); *id.* (arguing that VanOchten was "drunk, high, and shooting at birds" "in the direction of a propane tank, in a residential neighborhood"). So, in adopting the government's position, the district court necessarily found that VanOchten had smoked marijuana by the time of the shooting. As that factual finding is "plausible," it is not clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). In short, VanOchten's argument rests on a factual premise that the district court rejected.

\*     \*     \*     \*     \*

In affirming the district court, it bears emphasizing what we have—and have not—decided. Under *Williams*, § 922(g)(3) is constitutional in its application to dangerous individuals. VanOchten is dangerous because he has demonstrated that he poses a clear risk of

future harm to others if armed—he fired a rifle in a residential neighborhood in the direction of a propane tank while drunk and high. So the district court properly enforced § 922(g)(3) against him. The government, we note, also argues that § 922(g)(3)'s applicability can be justified in some circumstances consistent with historical laws regulating the possession of firearms by drunks and mentally ill people. Other Circuits have addressed these arguments. The Fifth Circuit, for example, has suggested that § 922(g)(3) can be applied to drug users who carry firearms in public while high. *Daniels*, 124 F.4th at 976. The Third Circuit, for its part, has recently held that, based on founding-era laws incapacitating drunks and mentally ill people, § 922(g)(3) can be applied to those "who pose a special danger of misusing firearms because they frequently use drugs." *United States v. Harris*, --- F.4th ----, 2025 WL 1922605, at *1, *7 (3d Cir. July 14, 2025). In the Third Circuit's view, the historical record justifies applying § 922(g)(3) to drug users who have not actually harmed anyone in the past; instead, § 922(g)(3) can be applied to a drug user based on the "nature" of his drug use and "the risk that it will impair his ability to handle guns safely." *Id.* at *7. We leave all of these arguments for another day.

With that understanding, we affirm.