IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 10, 2026

## STATE OF TENNESSEE v. ETHAN ALLEN COMPTON

**Appeal from the Circuit Court for Maury County**
**No. 30552     Jessica Parrish, Judge**

_____

### No. M2025-00217-CCA-R3-CD

_____

A Maury County jury convicted Defendant, Ethan Allen Compton, of possessing a firearm after having been convicted of a misdemeanor crime of domestic violence and unlawfully carrying or possessing a weapon.  The trial court imposed an effective sentence of eleven months and twenty-nine days to be served on probation.  On appeal, Defendant contends that Tennessee Code Annotated section 39-17-1307(f)(1)(A), which prohibits a person who has been convicted of a misdemeanor crime of domestic violence from possessing a firearm, violates the Second Amendment to the United States Constitution on its face.  Upon review, we conclude that Code section 39-17-1307(f)(1)(A) is constitutional on its face.  Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and CAMILLE R. MCMULLEN, J., joined.

Ryan W. Dugger, Columbia, Tennessee, for the appellant, Ethan Allen Compton.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Brent Cooper, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural History

On September 17, 2020, Defendant was arrested for domestic assault of his girlfriend.  According to the affidavit of complaint, witnesses observed Defendant strike

the victim multiple times with a closed fist while they were in a vehicle. The victim reported that Defendant struck her in the face and sprayed her with pepper spray. In December 2020, Defendant pleaded guilty to domestic assault in the General Sessions Court of Maury County, Tennessee. He was sentenced to eleven months and twenty-nine days to be served on probation. The disposition order was signed by Defendant and included a notification that he was required to terminate all firearms in his possession.

On June 4, 2023, officers arrested Defendant after he was found in possession of a .380 caliber pistol and a baton. On September 13, 2023, he was indicted on one count of possessing a firearm after having been convicted of a misdemeanor offense of domestic violence and one count of unlawfully carrying or possessing a weapon.

On December 11, 2023, Defendant filed a motion to dismiss the firearm charge. He asserted that Tennessee Code Annotated section 39-17-1307(f)(1)(A), which prohibits a person with a prior misdemeanor conviction for domestic violence from possessing a firearm, violated the Second Amendment of the United States Constitution and Article I, section 26 of the Tennessee Constitution. Defendant argued that the Second Amendment protects his possession of a firearm for personal protection regardless of any prior conviction and that Code section 39-17-1307(f)(1)(A) is inconsistent with our Nation's historical tradition of firearm regulation. The State filed a response in opposition to Defendant's motion. The State cited to longstanding prohibitions of the possession of firearms by those previously convicted of criminal offenses and argued that historical evidence supported the prohibition of firearm possession by those previously convicted of a misdemeanor offense of domestic violence.

A hearing was held on February 5, 2024, during which the parties did not present any proof but relied on arguments in support of their respective claims. On February 28, 2024, the trial court[1] entered an order denying Defendant's motion to dismiss. The court relied upon federal cases upholding the constitutionality of 18 U.S.C. § 922(g)(9), which is similar to Code section 39-17-1307(f)(1)(A), and concluded that the prohibition on the possession of firearms by those previously convicted of a misdemeanor domestic violence offense fits within the historical framework of keeping firearms away those found to be dangerous. The court, thus, determined that Code section 39-17-1308(f)(1)(A) was constitutional.

Defendant's case proceeded to trial on November 18, 2024. At the conclusion of the proof, the jury found Defendant guilty of both counts, as charged. The trial court

---

[1] Judge David L. Allen presided over the hearing on Defendant's motion to dismiss and entered an order denying the motion. Judge Allen subsequently retired, and Judge Jessica Parrish presided over Defendant's trial.

imposed an effective sentence of eleven months and twenty-nine days to be served on probation. Defendant filed a timely motion for new trial, which the court denied following a hearing. Defendant then filed a timely notice of appeal.

## Analysis

On appeal, Defendant challenges the constitutionality of Tennessee Code Annotated section 39-17-1307(f)(1)(A), asserting that the statutory provision violates the Second Amendment of the United States Constitution.[2] Code section 39-17-1307(f)(1)(A) provides that "[a] person commits an offense who possesses a firearm, as defined in § 39-11-106(a), and . . . [h]as been convicted of a misdemeanor crime of domestic violence as defined in 18 U.S.C. § 921, and is still subject to the disabilities of such a conviction[.]" A "misdemeanor crime of domestic violence" is an offense that

(i) is a misdemeanor under Federal, State, Tribal, or local law; and

(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, by a person similarly situated to a spouse, parent, or guardian of the victim, or by a person who has a current or recent former dating relationship with the victim.

18 U.S.C. § 921(a)(33)(A).

The federal counterpart to Code section 39-17-1307(f)(1)(A) is set forth in 18 U.S.C. § 922(g)(9). This provision provides that it is unlawful for a person, "who has been convicted in any court of a misdemeanor crime of domestic violence, . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(9).

### Standard of Review

The constitutionality of a statute is a question of law, which this court reviews de novo with no presumption of correctness given to the legal conclusions of the trial court.

---

[2] Although Defendant also cited to the Tennessee Constitution in his motion to dismiss filed in the trial court, he does not challenge the constitutionality of the statute under the Tennessee Constitution on appeal.

*See State v. Decosimo*, 555 S.W.3d 494, 506 (Tenn. 2018); *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003). Our supreme court has recognized that "[r]uling on a constitutional challenge to a statute is often an exercise in judicial restraint. We must be careful not to impose our own policy views on the matter or overstep into the General Assembly's realm of making reasoned policy judgments." *State v. Booker*, 656 S.W.3d 49, 56 (Tenn. 2022) (citing *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997)). Thus, this court must "start with a strong presumption that acts passed by the legislature are constitutional," particularly where "the facial constitutional validity of a statute is challenged." *Decosimo*, 555 S.W.3d at 506 (first quoting *Lynch v. City of Jellico*, 205 S.W.3d 384, 390 (Tenn. 2006); and then citing *Gallaher*, 104 S.W.3d at 459). This court must "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *Gallaher*, 104 S.W.3d at 459 (quoting *State v. Taylor*, 70 S.W.3d 717, 721 (Tenn. 2002)). The party challenging the constitutionality of a statute has a "heavy burden of overcoming that presumption." *Helms v. Tenn. Dep't of Safety*, 987 S.W.2d 545, 550 (Tenn. 1999).

"A constitutional challenge to a statute may be either facial or as-applied." *Fisher v. Hargett*, 604 S.W.3d 381, 396 (Tenn. 2020). A party raising a facial challenge to the constitutionality of a statute "contends that there are no circumstances under which the statute, as written, may be found valid." *Id.* at 396-97 (citing *City of Memphis v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013)). In raising an as-applied challenge, the party "contends that the statute is unconstitutional as construed and applied in actual practice against the [party] under the facts and circumstances of the particular case, not under some set of hypothetical circumstances." *Id.* at 397 (citing *City of Memphis*, 414 S.W.3d at 107).

The State views Defendant's argument on appeal as a facial challenge to the constitutionality of Code section 39-17-1307(f)(1)(A). Defendant does not specify in the argument portion of his brief whether he is making a facial challenge or an as-applied challenge. However, Defendant acknowledges in his brief that his challenge to the constitutionality of the statute in his motion to dismiss filed in the trial court was a facial challenge; he frames the issue in his brief as whether the trial court erred in denying the motion to dismiss; and he acknowledges that he has restated many of the arguments made in his motion to dismiss "due to de novo review." As framed by Defendant, the issue presented to this court is whether Code section 39-17-1307(f)(1)(A) *itself* violates the Second Amendment such that prosecutions under this statutory provision are never constitutional. Consistent with the way in which Defendant framed the issue, he argues in his brief that those convicted of domestic assault, including himself, are part of "the people" whose rights are protected under the Second Amendment, that Code section 39-17-1307(f) "is inconsistent with our [N]ation's historical tradition of firearm regulation," and that "[i]ndividuals convicted of a previous violent offense cannot be subjected to outright bans on firearm ownership." Defendant did not raise as a separate issue whether convicting *him* under Code section 39-17-1307(f)(1)(A) would violate the Second

- 4 -

Amendment under the unique facts and circumstances of his case, and he does not reference the facts and circumstances leading to his domestic assault conviction or his conviction under Code section 39-17-1307(f)(1)(A) in the argument portion of his brief. Accordingly, we conclude that Defendant has raised a facial challenge, rather than an as-applied challenge, to the constitutionality of Code section 39-17-1307(f)(1)(A). *See, e.g.*, *United States v. Nutter*, 137 F.4th 224, 228 (4th Cir. 2025) (determining that the defendant raised in his opening brief a facial challenge to the constitutionality of 18 U.S.C. § 922(g)(9) rather than an as-applied challenge when he raised the question of whether Section 922(g)(9) itself violated the Second Amendment and did not raise the separate issue of whether it would violate the Second Amendment to convict him under Section 922(g)(9) under the unique facts of his case).

A facial challenge to a statute is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). The possibility that Code section 39-17-1307(f)(1)(A) "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*

*Second Amendment Jurisprudence*

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Although the Second Amendment has been in existence for hundreds of years, the United States Supreme Court has only recently examined the Second Amendment in depth. *See District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (noting that "this case represents this Court's first in-depth examination of the Second Amendment"). In *Heller*, the Court examined the plain language in the Second Amendment and determined that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense." *McDonald v. City of Chicago*, 561 U.S. 742, 749-50 (2010) (citing *Heller*, 554 U.S. at 570). The Court stated that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Heller*, 554 U.S. at 592. The Court determined that a District of Columbia law categorically prohibiting the possession of handguns in a citizen's home was unconstitutional. *Id.* at 628-29. The Court reasoned that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection in one's home and family would fail constitutional muster." *Id.* (footnote omitted) (citations omitted).

However, the Court recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court did not "undertake an

exhaustive historical analysis . . . of the full scope of the Second Amendment" but stated that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-27. The Court subsequently held that the Second Amendment is applicable to the States through the Fourteenth Amendment. *See McDonald*, 561 U.S. at 750.[3]

Following *Heller*, various circuits of the United States Court of Appeals developed a conditional two-step test to assess Second Amendment claims. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). Under the first step, the government sought to justify the law "by "establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood," and the courts determined the original scope of the right based on its historical meaning. *Id.* at 18 (citations omitted). If the historical evidence was inconclusive or suggested that the regulated activity was not categorically unprotected, the courts proceeded to the second step in which the courts analyzed "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (citations omitted). Some courts concluded that "the core Second Amendment right is limited to self-defense in the *home*," and if the court determined that this "core" right was burdened, the court applied "strict scrutiny" and examined whether the government established that the law was "narrowly tailored to achieve a compelling governmental interest." *Id.* at 18-19 (emphasis in original) (citations omitted). Otherwise, the courts applied intermediate scrutiny and determined whether the government established that the law was "substantially related to the achievement of an important governmental interest." *Id.* at 19 (citation omitted).

In 2022, the Supreme Court extended *Heller*'s protection for carrying a handgun in the home to carrying them publicly. *Id.* at 8-9. In doing so, the Court rejected the two-step framework as "one step too many." *Id.* at 19. The Court stated that although the first step was "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history," *Heller* did not support the application of the

---

[3] A plurality of the Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *McDonald*, 561 U.S. 791. Justice Thomas authored a concurring opinion in which he agreed that the Second Amendment was applicable to the States through the Fourteenth Amendment but reasoned that the Second Amendment was applicable to the States through the Privileges and Immunities Clause rather than the Due Process Clause of the Fourteenth Amendment. *Id.* at 805-06 (concurring, Thomas, J.).

means-end scrutiny set forth in the second step. *Id.* "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* The Court "reiterate[d]" the following standard for applying the Second Amendment:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (citation omitted).

The Court stated that courts are required "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 27. The Court explained that when considering present-day firearm regulations "that were unimaginable at the founding," the historical inquiry "will often involve reasoning by analogy," and "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* at 28-29 (citation omitted). Recognizing the need for "some metric enabling the analogizer to assess which similarities are important and which are not," the Court noted that *Heller* and *McDonald* identified "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29 (citations omitted). Because "individual self-defense is the *central component* of the Second Amendment right," *id.* (quoting *McDonald*, 561 U.S. at 767), "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry," *id.* (*Heller*, 554 U.S. at 599 (emphasis in original)). "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphasis in original).

In *Bruen*, the Court addressed the constitutionality of a New York statute criminalizing the possession of a firearm without a license, whether inside or outside the home, and requiring a person seeking a license to carry a concealed pistol or revolver outside the home to establish "proper cause" for doing so. *Id.* at 11-13. The Court stated that it was undisputed that the two petitioners challenging the law—"two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects." *Id.* at 31-32 (quoting *Heller*, 554 U.S. at 580). The Court noted that the parties also did not

- 7 -

dispute that handguns are "'in common use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627). Recognizing that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," the Court concluded that "[t]he Second Amendment's plain text thus presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense." *Id.* at 32-33.

The Court then examined whether the respondents as government entities met their burden of showing that New York's proper-cause requirement is consistent with our Nation's historical tradition of regulation. *Id.* at 33-34. The Court stated that in interpreting the Constitution, "not all history is created equal" and that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 34 (quoting *Heller*, 554 U.S. at 634-35 (emphasis added in *Bruen*)). Historical evidence that long predates the Second Amendment's adoption in 1791 and the Fourteenth Amendment's adoption in 1868 "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* Rather, "'[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*,' not as they existed in the Middle Ages. *Id.* at 39 (quoting *Ex parte Grossman*, 267 U.S. 87, 108-09 (1925) (emphasis added in *Bruen*)).

The Court in *Bruen* also cautioned against "giving postenactment history more weight than it can rightly bear." *Id.* at 35. The *Bruen* Court acknowledged that in *Heller*, the Court identified evidence of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" as representing a "critical tool of constitutional interpretation" and that the Court, thus, examined "a variety of legal and other sources to determine *the public understanding* of [the Second Amendment] after its . . . ratification." *Id.* (quoting *Heller*, 554 U.S. at 605 (emphasis in *Bruen*)). Accordingly, "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* at 36 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment)). However, the Court in *Bruen* stated that "to the extent later history contradicts what the text says, the text controls," and "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (citations omitted). Furthermore, with regard to post-Civil War discussions of the right to keep and bear arms, the Court noted that in *Heller*, it considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions" and that such evidence was "treated as mere confirmation of what the Court thought had already been established." *Id.* at 37 (quoting *Gamble v. United States*, 587 U.S. 678, 702 (2019)).

Finally, the Court acknowledged that although New York's obligation to respect the right to keep and bear arms is based on the Fourteenth Amendment, the Court has "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* (citations omitted). The Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* (citations omitted). The Court noted "ongoing scholarly debate" regarding whether courts should rely primarily upon "the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 37-38 (citations omitted). The *Bruen* Court declined to address the issue because the Court determined that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

The *Bruen* Court considered the historical resources identified by the respondents using these guidelines and concluded that "apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense" and that there is no "such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* The Court concluded that New York's proper-cause requirement violated "the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

In *United States v. Rahimi*, the Supreme Court applied the standard set forth in *Bruen* to the defendant's Second Amendment facial challenge to 18 U.S.C. § 922(g)(8), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm if the order includes a finding that the individual "represents a credible threat to the physical safety of [an] intimate partner" or a child of the partner or individual. *United States v. Rahimi*, 602 U.S. 680, 684-86 (2024) (quoting 18 U.S.C. § 922(g)(8)). The Fifth Circuit Court of Appeals held that Section 922(g)(8) was unconstitutional, concluding that the provision did not fit within our Nation's tradition of firearm regulation. *Id.* at 689. The Supreme Court reversed, concluding that "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." *Id.* at 690. The Court explained that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms" and that "[a]s applied to the facts of this case, Section 922(g)(8) fits comfortably within this tradition." *Id.*

The Court noted that the defendant challenged the constitutionality of Section 922(g)(8) on its face, which "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *Id.* at 693 (quoting *Salerno*, 481 U.S. at 745). The Court explained that "to prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications." *Id.* The Court determined that Section 922(g)(8) is constitutional as applied to the facts of the defendant's own case. *Id.*

The Court conducted a historical analysis, observing that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others" and that Parliament began codifying prohibitions against similar conduct in the 1200s and 1300s. *Id.* at 693-94 (first citing *Sir John Knights Case*, 3 Mod. 117, 118, 87 Eng. Rep. 75, 76 (K. B. 1686), and then citing *Bruen*, 597 U.S. at 40). The Court noted that throughout the centuries, English law disarmed "brigands," "highwaymen," political opponents, and "disfavored religious groups" but that by the time of this Nation's founding, the Second Amendment and state constitutions "had largely eliminated governmental authority to disarm political opponents." *Id.* at 694 (citing *Heller*, 554 U.S. at 594-95, 600-03). The Court stated that "regulations targeting individuals who physically threatened others persisted" and that "[s]uch conduct was often addressed through ordinary criminal laws and civil actions, such as prohibitions on fighting or private suits against individuals who threatened others." *Id.* (citing 4 William Blackstone, Commentaries *145-46, *149-50).

The Court stated that by the 1700s and early 1800s, two distinct legal regimes specifically addressing firearm violence had developed: (1) surety laws, which "provided a mechanism for preventing violence before it occurred," and (2) "going armed" laws, which "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 694-95, 697. The surety laws authorized magistrates to require those suspected of future misbehavior to post a bond; those who failed to post a bond were jailed; and those who broke the peace after posting a bond forfeited the bond. *Id.* at 695 (citing 4 Blackstone *251, *253; Mass. Rev. Stat., ch. 134, § 6 (1836)). The Court recognized that the surety laws were "[w]ell entrenched in the common law" and were invoked "to prevent all forms of violence, including spousal abuse." *Id.* The Court noted that the surety laws also addressed the misuse of firearms in that numerous jurisdictions had statutes authorizing the imposition of bonds from those who went armed with offensive and dangerous weapons, and the Court specifically cited to a 1795 Massachusetts statute and its subsequent amendment. *Id.* at 696 (first citing 1795 Mass. Acts ch. 2, in Acts and Resolves of Massachusetts, 1794-95, ch. 26, pp. 66-67 (1896); then citing Mass Rev. State., ch. 134, § 16); and then citing *Bruen*, 597 U.S. at 56, and n. 23).

The Court stated that the "going armed" laws were a "particular subset of the ancient common-law prohibition on affrays" and that although affrays typically involved fighting in public, affrays were also understood to include the offense of "arm[ing]" oneself "to the Terror of the People." *Id.* at 697 (quoting T. Barlow, The Justice of the Peace: A Treatise 11 (1745)). The Court noted that "[w]hether classified as an affray law or a distinct prohibition, the going armed laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Id.* (quoting 4 Blackstone 149). The conduct "disrupted the 'public order' and 'le[d] almost necessarily to actual violence.'" *Id.* (quoting *State v. Huntly*, 25 N.C. 418, 421-22 (1843) (per curiam)). These acts were punished through "forfeiture of arms . . . and imprisonment." *Id.* (quoting 4 Blackstone 149). The Court cited to instances in which the prohibitions on going armed and affrays were incorporated into American common law. *Id.* (first citing *State v. Huntley*, 25 N.C. 418, 421-22 (1843); then citing *O'Neill v. State*, 16 Ala. 65, 67 (1849); and then citing *Hickman v. State*, 996 A.2d 974, 983 (Md. App. 2010)). The Court also cited to early statutory codifications of the prohibitions on going armed. *Id.* (first citing 1786 Va. Acts ch. 21; then citing 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652-53 (1807); then citing Acts and Laws of His Majesty's Province of New Hampshire in New-England 2 (1761); and then citing Collection of All of the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 131 (1751) (1741 statute)).

The Court concluded that when considered together, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. The Court explained that Section 922(g)(8) need not be identical to "these founding era regimes" and that "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.* The Court explained that Section 922(g)(8)(C)(i), like the surety and going armed laws, "applies to individuals found to threaten the physical safety of another" and that the statutory provision is "relevantly similar" to the found era surety and going armed regimes "in both *why* and *how* it burdens the Second Amendment right." *Id.* (emphasis added) (citing *Bruen*, 597 U.S. at 29). Like the surety and going armed laws, Section 922(g)(8) "restricts gun use to mitigate demonstrated threats of physical violence," and unlike the regulation held to be unconstitutional in *Bruen*, Section 922(g)(8) does not include a broad restriction of firearm use by the public in general. *Id.*

The Court determined that the burden on the right to bear arms imposed by Section 922(g)(8) "fits within our regulatory tradition." *Id.* The Court explained that like the surety and going arms laws, which "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon," Section 922(g)(8) only applies once a court has found that the defendant "represents a credible

threat to the physical safety" of another. *Id.* at 699 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). The Court further explained that like surety bonds, which had limited duration, the restriction imposed by Section 922(g)(8) was temporary in that firearm possession is prohibited so long as the defendant "is" subject to a restraining order. *Id.* The Court noted that "the penalty—another relevant aspect of the burden—also fits within the regulation tradition," explaining that the going armed laws provided for imprisonment and that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.*

The Court acknowledged that it had determined in *Bruen* that the surety laws were not a proper historical analogue for New York's gun licensing regime because the surety laws "presumed that individuals had a right to . . . carry," while New York statute "effectively presumed that no citizen had such a right, absent a special need." *Id.* at 699-700 (quoting *Bruen*, 597 U.S. at 56). The Court stated that Section 922(g)(8)(C)(i) "does not make the same faulty presumption" but, like the surety laws, presumes "that the Second Amendment right may only be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* at 700. The Court emphasized that "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not" and that "[t]he conclusion that focused regulations like the surety laws are not a historical analogue for a broad prohibitory regime like New York's does not mean that they cannot be an appropriate analogue for a narrow one." *Id.*

The Court stated that the Fifth Circuit made two fatal errors in concluding that Section 922(g)(8) violated the Second Amendment: (1) "it read *Bruen* to require a 'historical twin' rather than a 'historical analogue,'" *id.* at 701 (quoting *Bruen*, 597 U.S. at 30), and (2) "it did not correctly apply our precedents governing facial challenges," *id.* The Court explained that "[w]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacture conflict." *Id.* (quoting *United States v. Hansen*, 599 U.S. 762, 781 (2023)). The Court stated that the Fifth Circuit did not consider those circumstances in which Section 922(g)(8) would most likely be constitutional but "instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns." *Id.*

The Court concluded that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 700. The Court further concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702. Thus, the Court held that Section 922(g)(8)(C)(i) did not violate the Second Amendment. *Id.*

- 12 -

Applying *Bruen* and *Rahimi*, federal courts have consistently held that 18 U.S.C. § 922(g)(9), the federal statute prohibiting possession of firearms by those convicted of a misdemeanor crime of domestic violence, was not unconstitutional on its face. *See, e.g. United States v. Martinez*, __ F.4th __, 2026 WL 760056, at *3-6 (9th Cir. Mar. 18, 2026); *United States v. Minor*, 165 F.4th 616, 622-25 (1st Cir. 2026); *United States v. Simmons*, 150 F.4th 126, 130-34 (2nd Cir. 2025); *United States v. Jackson*, 138 F.4th 1244, 1250-55 (10th Cir. 2025); *Nutter*, 137 F.4th at 229-33; *United States v. Bernard*, 136 F.4th 762, 764-66 (8th Cir. 2025); *United States v. Gailes*, 118 F.4th 822, 824-30 (6th Cir. 2024). Other states also have rejected Second Amendment challenges to state statutes prohibiting those convicted of a misdemeanor domestic violence offense from possessing a firearm. *See, e.g. State v. Keiffer*, 17 N.W.3d 651, 663-66 (Iowa 2025) (as-applied challenge); *State v. McCray*, 579 P.3d 126, 132-38 (Kan. 2025) (facial and as-applied challenges).

### *Constitutionality of Tenn. Code Ann. § 39-17-1307(f)(1)(A)*

Against this backdrop, we address Defendant's facial challenge to the constitutionality of Tennessee Code Annotated section 39-17-1307(f)(1)(A) under the Second Amendment. In examining whether Code section 39-17-1307(f)(1)(A) violates the Second Amendment, we must first ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* The State then has the burden of justifying the statutory regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Defendant maintains that the plain language of the Second Amendment protects his possession of a firearm for personal protection regardless of any prior criminal convictions. The State does not dispute that the Second Amendment's plain text encompasses Defendant's firearm possession. Thus, we must determine whether the State has met its burden of demonstrating that Code section 39-17-1307(f)(1)(A) is consistent with this Nation's historical tradition of firearm regulation.

As noted by the Supreme Court, "[d]omestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *United States v. Castleman*, 572 U.S. 157, 160 (2014) (citations omitted). Domestic violence has a high recidivism rate. *See Gailes*, 118 F.4th at 829 (collecting studies). Although convicted felons have long been barred from possessing firearms, "many perpetrators of domestic violence are convicted only of misdemeanors." *Castleman*, 572 U.S. at 160 (citing *United States v. Hayes*, 555 U.S. 415, 418, 426 (2009)). In 1996, Congress enacted 18 U.S.C. § 922(g)(9), prohibiting the possession of firearms by anyone convicted of "a misdemeanor crime of domestic violence." This provision was

enacted "to close a dangerous loophole in the gun control laws" given that "firearms and domestic strife are a potentially deadly combination." *Id.* at 159-60 (quoting *Hayes*, 555 U.S. at 427). In 2009, Tennessee Code Annotated section 39-17-1307 was amended to include subsection (f)(1)(A), which prohibits a person convicted of "a misdemeanor crime of domestic violence as defined in 18 U.S.C. § 921, and is still subject to the disabilities of such a conviction" from possessing a firearm.

Defendant notes that possession of a firearm by an individual previously convicted of a misdemeanor crime of domestic violence "has not always been a crime in Tennessee," and the State acknowledges that Code section 39-17-1307(f)(1)(A) does not have a "historical twin." *See Rahimi*, 602 U.S. at 701. However, the State need not establish a "historical twin" but need only to establish a "historical analogue." *See id.* To constitute proper historical analogues, the historical regulations must be "relevantly similar" to Code section 39-17-1307(f)(1)(A) in "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. Whether Code section 39-17-1307(f)(1)(A) and the historical regulations relied upon by the State "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations" in our analogical examination. *Id.* (quoting *McDonald*, 561 U.S. at 767 (emphasis in original)).

The State relies upon the historical authority cited by the Supreme Court in *Rahimi* in upholding the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits an individual from possessing a firearm while subject to a domestic violence restraining order, *see Rahimi*, 602 U.S. at 693-98, as historical analogues establishing that Code section 39-17-1307(f)(1)(A) is consistent with this Nation's historical tradition of firearm regulation.[4] Defendant responds that the surety laws relied upon by the Supreme Court in *Rahimi* do not serve as a historical analogue to Code section 39-17-1307(f)(1)(A) because unlike the surety laws in which the disarming is temporary, those convicted of a misdemeanor crime of domestic violence are permanently prohibited from possessing firearms. Defendant further maintains that unlike the defendant in *Rahimi*, who was found to pose a danger to others when the domestic violence restraining order was issued, the trial court did not make an individualized finding regarding whether Defendant posed a danger to others at the time that Defendant pleaded guilty to domestic assault.

We conclude that Code section 39-17-1307(f)(1)(A) is analogous to the founding era regime affray/going armed laws in that like those laws, the statute disarms those presenting a credible threat to the physical safety of others. *See Martinez*, __ F.4th at __,

---

[4] The State also relies upon colonial history of disarming groups that the State categorizes as "presumed to be dangerous" at that time based upon their race, political or religious affiliation as a historical analogue. We need not reach this issue because we conclude that the affray/going armed laws serve as a valid historical analogue to Code section 39-17-1307(f)(1)(A) under the *Bruen* framework.

2026 WL 760056, at \*4; *Simmons*, 150 F.4th at 133; *Nutter*, 137 F.4th at 231. The affray laws punished those who engaged in conduct of public fighting, violent displays, and "arming oneself 'to the Terror of the People'" through imprisonment and the forfeiture of firearms. *See Rahimi*, 602 U.S. at 697. The going armed laws restricted "gun use to mitigate demonstrated threats of physical violence." *Id.* at 698. Code section 39-17-1307(f)(1)(A) likewise disarms those whose past conduct resulting in a misdemeanor conviction of domestic violence demonstrates the same threat of physical violence. Based on the definition of "misdemeanor crime of domestic violence," every individual disarmed under Code section 39-17-1307(f)(1)(A) has been convicted of an offense in which the individual has been adjudicated by a court to have used or attempted to use physical force or threatened to use a deadly weapon against the victim. *See* 18 U.S.C. § 921(a)(33)(A)(ii); *see also* Tenn. Code Ann. § 39-17-1307(f)(1)(A) (utilizing the definition of "misdemeanor crime of domestic violence" set forth in 18 U.S.C. § 921).

The firearm prohibition set forth in Code section 39-17-1307(f)(1)(A) occurs only after a defendant is convicted of a qualifying misdemeanor offense of domestic violence by trial or plea that is secured under the standard of beyond a reasonable doubt and other criminal constitutional protections. Likewise, the affray/going armed laws were criminal in nature, subject to a burden of proof beyond a reasonable doubt, and subject to penalties of imprisonment and forfeiture of firearms. *See State v. Russell*, No. M2025-00261-CCA-R3-CD, 2026 WL 880523, at \*10 (Tenn. Crim. App. Mar. 31, 2026) (concluding that affray laws are a valid historical analogue to Tennessee's statute prohibiting those convicted of a felony drug offense from possessing firearms because "both regimes are grounded in the same underlying justification—protecting the public peace from conduct that creates a substantial risk of violent escalation" and both regimes "are criminal in nature, subject to the same burden of proof beyond a reasonable doubt, and enforceable through the same type of penalty—imprisonment and forfeiture of arms"); *cf. Rahimi*, 602 U.S. at 770-71 (Thomas, J., dissenting) (reasoning that the affray laws are not historical analogues to 18 U.S.C. § 922(g)(8) because the affray offenses were criminal in nature and required proof beyond a reasonable doubt and other criminal constitutional protections and a domestic violence restraining order is civil in nature and issued without a jury or any of the safeguards historically justifying disarmament).

Defendant attempts to distinguish *Rahimi*, arguing that the court issuing the domestic violence restraining order in *Rahimi* made an individualized finding of dangerousness at the time of the issuance of the restraining order but that in the instant case, there was no individualized finding of dangerousness when Defendant pleaded guilty to domestic assault. To the extent that Defendant argues that the Second Amendment permits legislation disarming an individual based on dangerousness only if a court has found that the individual posed a future threat of physical violence to another, other jurisdictions have overwhelmingly rejected this argument in upholding criminal statutes

prohibiting those convicted of misdemeanor offenses of domestic violence from possessing firearms. *See e.g., Martinez*, __ F.4th at __, 2026 WL 760056, at *5-6; *Minor*, 165 F.4th at 623-24; *Simmons*, 150 F.4th at 133-34; *Jackson*, 138 F.4th at 1254; *Bernard*, 136 F.4th at 765; *Gailes*, 118 F.4th at 829.  The statutory provision addressed in *Rahimi*, 18 U.S.C. § 922(g)(8)(C)(i), required that the domestic violence restraining order include a finding that the person subject to the order "represents a credible threat to the physical safety of an intimate partner or child."  However, the Court in *Rahimi* did not hold that a judicial finding of a future threat or future dangerousness was required for other subsections of 922(g) to pass constitutional muster.  *See Rahimi*, 602 U.S. at 693 ("Our analysis starts and stops with Section 922(g)(8)(C)(i) . . . ."); *see also Minor*, 165 F.4th at 624 (stating that "it is clear that the Court [in *Rahimi*] was not holding that a judicial finding of a forward-looking threat if required as a constitutional matter for other subsections of 922(g)).

Like the going armed laws, which treated past criminal conduct as a basis for disarmament due to the threat that violent behavior will recur, Code section 39-17-1307(f)(1)(A) treats past criminal domestic abuse as a basis for disarmament due to the threat that the abuse will recur.  Because both provisions disarmed those deemed dangerous to the public safety of others, we conclude that Code section 39-17-1307(f)(1)(A) is "relatively similar" to the founding era affray/going armed regime in why the provision burdens the Second Amendment.  *See Rahimi*, 602 U.S. at 698.

We next consider whether the affray/going armed laws and Code section 39-17-1307(f)(1)(A) impose comparable burdens on the Second Amendment.  The resulting burden of disarmament pursuant to Code section 39-17-1307(f)(1)(A) occurs only upon conviction for a qualifying misdemeanor offense of domestic violence.  The affray/going armed laws, likewise, were criminal offenses, and the resulting forfeiture of arms resulted only upon conviction.  Unlike the regulation held to be unconstitutional in *Bruen*, Code section 39-17-1307(f)(1)(A) "does not broadly restrict arms use by the public generally." *See Rahimi*, 602 U.S. at 698.  Rather, the statute "presupposes that the ordinary citizen retains the right to bear arms."  *See Russell*, 2026 WL 880523, at *10 (describing Tennessee's statute prohibiting possession of a firearm after having been convicted of a felony drug offense as "presuppos[ing] that the ordinary citizen retains the right to bear arms").  The affray/going armed laws likewise did not impose a categorical ban on the general public's right to carry.

Defendant argues that unlike the temporary disarmament that the Supreme Court recognized as constitutional in *Rahimi*, disarmament for a qualifying misdemeanor conviction of domestic violence is permanent.  This court recently noted that "an affray law-based restriction was often mitigated by the availability of a surety.  Surety laws, whether enacted as a stand-alone law or incorporated into 'going armed' statutes, allowed a convicted individual to post a bond and regain the ability to carry arms, therefore

rendering the disarmament temporary." *Id.* (citing *Brown*, 597 U.S. at 55-56). Even if the affray/going armed laws provided for temporary disarmament, Code section 39-17-1307(f)(1)(A) imposes a comparable burden on the Second Amendment as disarmament in this statutory provision, likewise, is not permanent. Code section 39-17-1307(f)(1)(A) prohibits an individual with a qualifying misdemeanor conviction of domestic violence from possessing a firearm if the individual "is still subject to the disabilities of such a conviction." Thus, under the statute's plain language, disarmament is not necessarily permanent but extends only as long as the individual is "subject to the disabilities" of the conviction.

Courts have uniformly held that the lack of an express temporal limitation on disarmament of those convicted of misdemeanor offenses of domestic assault does not render the statutory provision unconstitutional on its face. *See Minor*, 165 F.4th at 624-25; *Simmons*, 150 F.4th at 134; *Nutter*, 137 F.4th at 232; *Bernard*, 136 F.4th at 765-66; *Gailes*, 118 F.4th at 829. Furthermore, an argument that a prior misdemeanor conviction for domestic violence "should not permanently ban an individual from possessing firearms based on the amount of time that has lapsed since a conviction or a defendant's purported rehabilitation are better suited to as-applied challenges or as policy arguments to [the legislature] to advocate amending the statutory language." *Nutter*, 137 F.4th at 232. And concerning the policy argument, if our General Assembly wishes to allow certain persons to possess firearms following a conviction, that is its prerogative.[5] Such concerns do not render Code section 39-17-1307(f)(1)(A) unconstitutional on its face. *See Nutter*, 137 F.4th at 232. Defendant's temporal argument discounts the Supreme Court's concern in *Rahimi* with the temporal limitations in 18 U.S.C. § 922(g)(8), in part, related to the lower standards applied in obtaining a restraining order, but the longer prohibition of firearm possession set forth in Code section 39-17-1307(f)(1)(A) results from a conviction, which required a much higher standard. *See id.* at 233. As the Sixth Circuit has noted, "[i]f someone who is merely accused of committing domestic violence can be disarmed without offending the Second Amendment, then *a fortiori* someone with a valid conviction can also be disarmed." *Gailes*, 118 F.4th at 829.

We conclude that Tennessee Code Annotated section 39-17-1307(f)(1)(A) is consistent with the Nation's historical tradition of gun regulations as represented by the affray/going armed laws. This statutory provision, therefore, is constitutional on its face.

---

[5] We note that pending before the Tennessee General Assembly is a proposed amendment to Tennessee Code Annotated section 39-17-1307(f) whereby the offense of possession of a firearm after having been convicted of a misdemeanor crime of domestic violence applies to a person who has been convicted of a misdemeanor crime of domestic violence within the last five years and has not had their firearm rights restored or is otherwise still subject to the disabilities of the conviction. *See* Tennessee S.B. 2467, H.B. 2064 (2026).

Accordingly, the trial court properly denied Defendant's motion to dismiss, and Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.


_____ s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE